UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| JOHN D. SHERIDAN, S AND D | ) | |
| HOLDINGS, INC., | ) | |
| Plaintiffs, on behalf of | ) | |
| themselves and all those | ) | |
| similarly situated, | ) | 1:06-cv-1233-SEB-JMS |
| | ) | |
| vs. | ) | |
| | ) | |
| MARATHON PETROLEUM COMPANY | ) | |
| LLC, formerly known as MARATHON | ) | |
| ASHLAND PETROLEUM LLC, and | ) | |
| SPEEDWAY SUPERAMERICA LLC, | ) | |
| Defendants. | | |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

This cause is before the Court on the Defendants' Motion to Dismiss First

Amended Complaint [Docket No. 14], filed December 22, 2006.  Plaintiffs, John D.

Sheridan and his close corporation, S and D Holdings, Inc. ("S&D Holdings"), brought

this action against Defendants on August 15, 2006, as a prospective class action on behalf

of themselves and approximately 5,000 other Marathon and Speedway branded dealers

throughout the United States who are or were parties to Defendants' Service Station

Leases and/or Dealer Supply Arrangements.  Mr. Sheridan maintains that Defendants

have (1) violated Section 1 of the Sherman Act by including an unlawful tying

arrangement in their standardized lease agreements; (2) violated Section 1 of the Sherman

Act by engaging in unlawful price fixing; (3) breached the open price term of the

standardized lease agreement in connection with their fuel price setting process, thereby

breaching the implied covenants of good faith and fair dealing and violating the Uniform

Commercial Code ("UCC"), as codified under Ind. Stat. 26-1-2-305 and Ind. Stat. 26-1-2-

311; and (4) violated the Indiana Deceptive Franchise Practices Statute by engaging in

anti-competitive, deceptive, and unfair acts and by discriminating unfairly among its

franchises.

Defendants, Marathon Oil Corporation ("Marathon") and Speedway Superamerica

LLC ("Speedway"), contend that Plaintiffs fail to state claims upon which relief may be

granted and thus the complaint should be dismissed under Federal Rule of Civil

Procedure 12(b)(6).  Mr. Sheridan maintains that he has sufficiently stated claims against

Defendants and therefore the motion to dismiss should be denied.  For the reasons

detailed in this entry, we <u>GRANT</u> Defendants' motion on Counts I and II.  We decline to

exercise supplemental jurisdiction over the remaining state and common law claims

(Counts III-VI), and thus, dismiss them without prejudice for lack of jurisdiction.


**<u>Factual Background</u>**

Marathon is a leader in the crude oil and petroleum business, engaging in crude oil

refining, marketing, and transportation operations for petroleum products.  Compl. ¶ 23.[1]

Its headquarters and principal place of business are located in Findlay, Ohio.  Compl. ¶ 8.

Speedway is a wholly-owned subsidiary of Marathon and is also headquartered in Ohio

---

[1] "Compl." refers to the First Amended Class Action Complaint.

with its principal place of business there.  Id. ¶ 9.  Marathon is ranked as the fourth-largest U.S.-based integrated oil and gas company and the fifth-largest petroleum refiner in the United States, refining approximately 948,000 barrels of petroleum products per day at seven refineries.  Id. ¶ 24, ¶ 27.  It refines and markets gasoline and other petroleum products under both Marathon and Speedway brand names to approximately 5,600 Marathon and Speedway branded, direct-served retail outlets in seventeen states and sells petroleum products to independent entities serving approximately 3,700 jobber-served retail outlets.  Id. ¶¶ 25-26.  Marathon and Speedway sell approximately six billion gallons of gasoline per year, with many of those purchases coming from customers' credit and/or debit card transactions.  Id. ¶ 31.

Mr. Sheridan operates an independent Marathon branded gasoline service station in Indianapolis, Indiana, pursuant to a written agreement with Marathon.  Compl. ¶ 7, ¶ 32.  Mr. Sheridan subleases the station to S&D Holdings, of which he is the principal shareholder.  Id. ¶ 7.  Mr. Sheridan reports that before entities can purchase petroleum products from Marathon and Speedway for resale to consumers, they are required to execute a standardized Service Station Lease and Dealer Supply Agreement ("Lease").  Id. ¶ 32.  However, there is no fee associated with becoming a lessee-dealer.[2]  Defs.' Mem. at 11.  According to Mr. Sheridan, these documents require the lessee-dealer to

---

[2] There is disagreement between the parties as to whether the arrangements between Defendants and Plaintiffs are franchises under Indiana law.  Therefore, at this point, we will refer to them as "lessee-dealers."

accept all credit and debit cards authorized by Defendants and require that all such credit and debit card transactions be processed through Defendants.  Id. ¶ 34-35.  Defendants charge each lessee-dealer a processing fee and process the daily sales in batches through their own Electronic Point of Sale ("EPOS") system.  Id. ¶ 36.  They then apply those sales amounts (minus the processing fee) to the lessee-dealer's next gasoline invoice.  Id.

Plaintiffs claim that, but for this requirement, they could purchase credit and debit card processing services through a number of other service providers on more favorable terms and conditions.  Id. ¶ 37.  Additionally, Plaintiffs allege that Defendants have conspired with unnamed banks and financial institutions throughout the United States to "fix, peg and stabilize" the processing fee charged to Plaintiffs.  Id. ¶ 38.  Plaintiffs further allege that Defendants then receive a portion of that processing fee as compensation or a "kick back" as consideration for the agreement to fix the price of the fee, which is not reimbursed to the lessee-dealers.  Id. ¶ 39.

Every lessee-dealer is required to purchase all of the motor fuel sold at its service station directly from Marathon.  Compl. ¶ 43.  Marathon's lease agreements include an open-price term, under which lessee-dealers buy their fuel at Marathon's "Dealer Tankwagon Price per gallon in effect on the date of shipment."  Ex. 1, ¶ 8.  Plaintiffs claim that in addition to selling motor fuel to its lessee-dealers, Marathon is marketing motor fuel and other convenience store items directly to customers at its own service stations in Indiana under the Speedway and Superamerica brand names.  Compl. ¶ 44.  According to Plaintiffs, they are unable to make sufficient profit margins and compete

4

with Marathon's company-owned and operated stations because Marathon has

implemented its pricing mechanisms in a commercially unreasonable and discriminatory

manner.  Id. ¶ 45.


## Legal Analysis

### I.    *Standard of Review*

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss

this action for failure to state a claim upon which relief may be granted.  The Supreme

Court recently addressed the proper application of the federal notice pleading standards,

particularly in regard to antitrust actions, in Bell Atlantic Corp. v. Twombly, 127 S. Ct.

1955 (2007).  Although a complaint does not require detailed factual allegations to

withstand a Rule 12(b)(6) challenge, "a plaintiff's obligation to provide the 'grounds' of

his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  Id. at1964-65 (citing Papasan

v. Allain, 478 U.S. 265, 286 (1986)).  The factual allegations must "raise a right to relief

above the speculative level."  Id. at 1965.

In Bell Atlantic Corp., the Court "retire[d]" the frequently quoted language of

Conway v. Gibson, 355 U.S. 41, 45-46 (1957), "that a complaint should not be dismissed

for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief."  Bell Atlantic Corp.,

127 S. Ct. at 1968-69.  According to the Seventh Circuit, the Supreme Court's decision to

retire this language was based in part on the Court's concern that the "no set of facts" language "might be invoked to condemn the defendant in an antitrust case to conducting expensive pretrial discovery, in order to demonstrate the groundlessness of the plaintiff's case." In re Ocwen Loan Servicing, LLC Mortg. Servicing Litigation, 491 F.3d 638, 649 (7th Cir. 2007). Instead, at the pleading stage, there must be "allegations plausibly suggesting (not merely consistent with) agreement." Bell Atlantic Corp., 127 S. Ct. at 1966. In other words, the mere possibility of later "unearthing direct evidence" through discovery is not enough to preclude dismissal. Id. at 1968.

However, a party moving to dismiss still bears a weighty burden. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 1960 (citing Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) ("[At the pleading stage] the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.")). Therefore, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the case in which the allegations of the complaint itself clearly demonstrate that a plaintiff does not have a claim. Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, Inc., 161 F. Supp. 2d 948, 951 (S.D. Ind. 2001) (citing 5A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure: Civil § 1357). In addressing a Rule 12(b)(6) motion, we treat all well-pleaded factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in the light most favorable to the nonmovant. Lee v. City of Chicago, 330 F.3d 456, 459

6

(7th Cir. 2003); <u>Szumny v. Am. Gen. Fin.</u>, 246 F.3d 1065, 1067 (7th Cir. 2001).

**II.**  *Discussion*

    **A.**  **Section I of the Sherman Act**

       Section 1 of the Sherman Act prohibits every contract, combination or conspiracy

in restraint of trade.  15 U.S.C. § 1.  To establish a claim under Section 1, a plaintiff must

establish a contract, conspiracy or combination that "had the effect of unreasonably

restraining trade under the 'rule of reason,' except in the limited cases referred to as <u>per</u>

<u>se</u> violations."  <u>U.S. v. Andreas</u>, 216 F.3d 645, 666 (7th Cir. 2000) (citations omitted).

When a <u>per se</u> violation is alleged, an in-depth analysis of the action's illegality is not

required because such violations "are actions where the nature and necessary effects that

result are [] plainly anticompetitive."  <u>Tri-Gen Inc. v. Int'l Union of Operating Engineers</u>,

433 F.3d 1024, 1032 (7th Cir. 2006).  In such cases, "a showing of anticompetitive effect

is <u>not</u> required to establish a Sherman Antitrust Act violation - the conduct is considered

anticompetitive without an inquiry into the precise harm caused."  <u>Bunker Ramo Corp. v.</u>

<u>United Business Forms, Inc.</u>, 713 F.2d 1272, 1284 (7th Cir. 1983).  However, the mere

act of attaching the <u>per se</u> label to defendants' conduct is not enough to sustain a

complaint; the allegedly illegal activity "must be scrutinized to determine whether such

characterization is appropriate."  <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101,

1108 (7th Cir. 1984) (citing <u>Bunker Ramo Corp.</u>, 713 F.2d at 1284).

       If a plaintiff fails to state a claim under the <u>per se</u> standard, the claim can still be

saved by the rule of reason.  Reifert v. South Central Wisconsin MLS Corp., 450 F.3d 312, 317 n.2 (7th Cir. 2006), cert denied 127 S.Ct. 1494 (2007) (citing Carl Sandburg Village Condominium Assoc. No. 1 v. First Condominium Development Co., 758 F.2d 203, 210 (7th Cir. 1985)).  To state a claim under the rule of reason, a plaintiff must show an anticompetitive effect, which requires "actual harm to competition" as a result of the challenged activity.  Bunker Ramo Corp., 713 F.2d at 1283.  Thus, "[i]t is not the unfair means the defendants employed that is to be the focus of the inquiry, but whether those means 'lessened competition.'" Id. (citing Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Assoc., 672 F.2d 1280, 1288 (7th Cir. 1982); Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 558 (7th Cir. 1980)).

### 1.    Tying Arrangement - Count I

The Sherman Act prohibits tying arrangements, where the availability of one product or service is conditioned upon purchasing another product or service.  Carl Sandburg Village Condominium, 758 F.2d at 207.  However, not all tying arrangements are illegal under the Sherman Act.  McLaughlin Equip. Co. v. Servaas, 2004 WL 1629603, at *15 (S.D. Ind. 2004) (Tinder, J.).  "[T]he substantive theory of tying law depends on coercion to take two products as a package."  Will v. Comprehensive Accounting Corp., 776 F.2d 665, 669 (7th Cir. 1985).  Therefore, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different

8

terms." <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 12 (1984).

In the Seventh Circuit, to establish a violation of Section I of the Sherman act as a result of a <u>per se</u> illegal tying arrangement, a plaintiff must demonstrate that: (1) a tie between two distinct products or services exists; (2) the tying seller has sufficient economic power in the tying product market to restrain free competition in the tied product market; (3) the tie affects a not-insubstantial amount of interstate commerce in the tied product, and (4) the tying seller has some economic interest in the sales of the tied product. <u>Reifert</u>, 450 F.3d at 316.

### a. Existence of a Tie

Plaintiffs allege that the lease agreements, which Defendants require Plaintiffs and all other members of the purported class to sign before they may distribute Marathon and Speedway-branded gasoline for resale to consumers, require every lessee-dealer to process all credit and debit card transactions through Defendants. Compl. ¶ 34. Plaintiffs claim the Marathon and Speedway distributorship is the "tying" product and the credit and debit card processing services are the "tied" product. <u>Id.</u> ¶¶ 50-51. Plaintiffs allege this arrangement is a <u>per se</u> illegal tying arrangement. <u>Id.</u> ¶ 56. Defendants rejoin that the documents incorporated into the complaint contain no such requirement and therefore Plaintiffs have pleaded themselves out of court by electing to "specifically allege that [they are] bound by a contractual tying provision, which, in fact, the documents demonstrate does not exist." Defs. Reply at 4-5.

Defendants contend that when, as here, written exhibits attached to the complaint

9

contradict the allegations made in the complaint, the documents control.  Northern Ind.
Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998) ("It
is a well-settled rule that when a written instrument contradicts allegations in the
complaint to which it is attached, the exhibit trumps the allegations.").  The Seventh
Circuit recognizes that "[a] plaintiff may plead himself out of court by attaching
documents to the complaint that indicate that he or she is not entitled to judgment."  In re
Wade, 969 F.2d 241, 249 (7th Cir. 1992).  Plaintiff attached a copy of the Lease to the
complaint as Exhibit A, and thus, the Lease is treated as a part of the pleadings.
Additionally, "[d]ocuments that a defendant attaches to a motion to dismiss are
considered part of the pleadings if they are referred to in the plaintiff's complaint and are
central to [plaintiff's] claim."  Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d
429, 431 (7th Cir. 1993).  The Credit Card Handbook ("Handbook"), which Defendants
attached to the motion to dismiss, is referenced in the lease provision Plaintiffs' quote in
the complaint.  See Compl. ¶ 35.  The Handbook is central to Plaintiffs' claims because
they allege that the Lease requires them to process credit and debit card transactions
solely through Defendants, but the Lease states only that all such transactions must be
conducted in compliance with the Handbook.  Thus, reference to the Handbook is
necessary and consequently also considered part of the pleadings.

        Defendants emphasize that the Lease incorporated into Plaintiffs' complaint does
not include language mandating that lessee-dealers use specific credit card processing
services chosen by Defendants.  The only provision in the agreement that discusses credit

and debit card transactions provides as follows:

> If, and for so long as, MAP [Marathon] elects to issue or authorize credit
> cards, LESSEE agrees to honor them for purchases of petroleum and
> other products, services provided and merchandise sold at or from the
> Premises.  All such credit card sales shall be made in strict compliance
> with the rules and regulations issued by MAP from time to time
> governing credit card usage in its Credit Card Handbook . . . .  MAP
> agrees to accept all authorized invoices issued on such credit cards and
> credit LESSEE's account or issue a check to LESSEE for the net amount
> thereof.  MAP reserves the right to return, and LESSEE agrees to
> promptly refund to MAP on demand, the amount so credited for each
> invoice which was not authorized, which is for any reason disputed by
> the customer, or which is otherwise subject to chargeback under MAP's
> rules and regulations.  If LESSEE fails to comply with these provisions
> and MAP's rules and regulations, MAP may, at its option, limit or
> cancel LESSEE's right to participate in MAP's credit card program.

Ex. 1 at ¶ 9.  Thus, the Lease itself makes no mention of particular credit and debit card

processing services lessee-dealers must use; it only requires that credit and debit card

transactions be conducted in a way that conforms with the Handbook.

Defendants further argue that in the Handbook, the only provision requiring that

particular credit and debit card processing services be used applies solely to the

Marathon-branded credit card.  That provision provides:

> **MARATHON® PLATINUM MASTERCARD® PROCESSING
> REQUIREMENTS**
>
> To ensure your customers will automatically receive the generous
> Marathon rebates negotiated with our cobrand business partner,
> JPMorgan Chase Bank and for you, our MAP Brand customer to
> receive the lower credit card discount processing fee of 1% on all
> Marathon® Platinum Mastercard® transactions you are **required** to
> process all sales through Marathon's existing proprietary network.
> **Transactions not processed in this manner will be assessed a 4% of
> the transaction amount plus a $10 per transaction fee for each**

11

**instance of non-compliance.**

Ex. 2 at C-3.  Thus, even though "required" to use Defendants' existing network for

processing Marathon® Platinum Mastercard® transactions, lessee-dealers may still

process those transactions elsewhere, for an additional fee.

In response, Plaintiffs point to additional provisions in the Handbook that discuss

Marathon-approved EPOS systems and other equipment, such as VeriFone terminals and

printers, which lessee-dealers may lease from Defendants.  Pls.' Resp. at 8-9.  However,

as Defendants emphasize, these provisions seem to apply only to those lessee-dealers

choosing to use such services, rather than requiring all lessee-dealers to do so.  Defs.

Reply at 5.  The Handbook provides that "[a]ll MAP dealers that process credit card sales

for electronic submission to MAP must use an electronic Point of Sale (POS) system that

has been certified by MAP."  Ex. 2 at A-1 (emphasis added).  Additionally, the section

addressing lesee-dealers' obligations in regard to leasing VeriFone terminals[3] only applies

"if using leased VeriFone equipment."  Id. (emphasis added).

The only tying theory Plaintiffs allege is that the Lease contains an express tie

requiring lessee-dealers to process all credit and debit card transactions through

Defendants.  Compl. ¶¶ 50-51.  Plaintiffs do not allege implicit coercion by Defendants to

force lessee-dealers to use particular credit or debit card processing services, nor do

Plaintiffs allege that the provision requiring them to use Marathon's services for the

---

[3] VeriFone equipment is transaction processing software used to handle credit and debit
card payments.

Marathon-branded card constitutes a violation.  Although Plaintiffs correctly contend that they are not required to set out in detail the facts upon which the claim is based, in this case, they have made a specific allegation and incorporated documents that, on their face, do not support that allegation.  Plaintiffs argue that "[o]nce [they] are allowed to begin the discovery process, [they] will be able to demonstrate that [they] are required to process all credit and debit card transactions solely through MARATHON and SPEEDWAY."  Pls.' Resp. at 9.  However, as the Supreme Court recently made clear in <u>Bell Atlantic</u>, "[i]t is no answer to say that a claim just shy of plausible entitlement to relief can, if groundless, be weeded out early in the discovery process . . . ."  <u>Bell Atlantic Corp.</u>, 127 S. Ct. at 1967.  Therefore, for the reasons detailed above, we find that Plaintiffs have failed to allege an illegal tie.

### b.    Two Separate Products

However, even if Plaintiffs had sufficiently alleged the existence of an explicit tie, in order to satisfy the first element of a <u>per se</u> violation and survive a Rule 12(b)(6) motion, Plaintiffs must also allege that the tie is between two distinct products or services. Plaintiffs argue they have done so by alleging that the Marathon and/or Speedway distributorship is a tying product separate from the credit and debit card processing services.  Compl. ¶¶ 50-51.  Defendants rejoin that the distributorship is "nothing more than a set of contractual rights, responsibilities, policies, and procedures for running a service station business." Defs.' Mem. at 11.  They claim, as a matter of law, distributorship rights do not constitute a separate tying product and thus, Plaintiffs have

13

failed to properly allege a tying arrangement.  Id. at 10.

     A tying arrangement can only exist if "two separate product markets have been linked." Jefferson Parish, 446 U.S. at 21.  Simply requiring a buyer to purchase components of a single product together does not satisfy this element.  See Chawla v. Shell Oil Co., 75 F. Supp. 2d 626, 635 (S.D. Tex. 1999).  Although we have been unable to find a decision in which the Seventh Circuit has directly addressed this issue, the Seventh Circuit has recognized difficulties inherent in considering distributorship or franchise rights to be tying products.  See Will, 776 F.2d at 671 n.1 ("'[F]ranchises . . . are just names and methods of doing business, not 'products'" and "a method of doing business (the franchise) is not sold separately from the ingredients that go into the method of business.").  Based in part on the analysis in Will, this court has expressed that "it seems unlikely that the [Seventh] Circuit would conclude that a distributorship or distributorship rights could constitute a tying product." McLaughlin Equipment Co., 2004 WL 1629603, at *17 (Tinder, J.) (rejecting the tying claim on other grounds).

     We are also persuaded by the analysis of the Southern District of Texas in Chawla v. Shell Oil Co., 75 F. Supp. 2d 626 (S.D. Tex. 1999).  In Chawla, the plaintiffs, who were independent lessee-dealers of Shell-brand gasoline, challenged the defendants' "pay at the pump" program.  Id. at 630.  The plaintiffs alleged they were being coerced both to lease certain equipment to enable customers to pay for gasoline purchases at the pumps and "to agree to utilize the bank chosen by Defendants to process the associated credit card transactions."  Id.  The court granted the defendants' motion to dismiss the

plaintiffs' tying claim under Rule 12(b)(6) in part because it found that the "[p]laintiffs artificially attempt to separate the means of delivery of the Shell gasoline to retail customers from the franchise relationship."  Id. at 639.  The court further concluded that "[r]eceipt and processing of retail customers' payments for retail gasoline purchases is an integral part of a gasoline dealer's function."  Id.  Here, like in Chawla, the credit and debit card processing services utilized are simply a part of the standardized methods used to carry out the business of the distributorship, and thus, Plaintiffs have failed to allege a tie between two separate and distinct products or services.  For the reasons detailed above, Defendants' motion to dismiss Count I is GRANTED.[4]

### 2. Price Fixing Conspiracy - Count II

Plaintiffs allege that Defendants have conspired with many unnamed banks, banking associations and financial institutions to fix the price of the credit and debit card processing fees that Defendants charge when Plaintiffs utilize those services.  Compl. ¶ 38.  Additionally, Plaintiffs claim that Defendants receive a "kick back" from the same institutions as consideration for the alleged agreement.  Id. ¶ 39.  Defendants rejoin that Plaintiffs' allegations neither satisfy the notice pleading standard under Rule 8(a) nor properly state a Sherman Act violation under either a per se or rule of reason standard.

---

[4] Defendants raise additional arguments in their motion to dismiss Count I related to the Plaintiffs' failure to allege a relevant tying market and an anticompetitive effect in the tied market.  However, because we find that Plaintiffs have not adequately alleged the existence of a tie between two separate and distinct products or services, we do not reach these arguments.

As we have previously noted, the pleading standard under Rule 8(a), as applied in the antitrust context, was recently addressed by the Supreme Court, which held that antitrust claims "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1974. Thus, the facts must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 1965. In Bell Atlantic, the plaintiffs based their claim of agreement on descriptions of defendants' parallel conduct, with only "a few stray statements speak[ing] directly of agreement." Id. at 1970. The Court held that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Id. at 1966. The Court also noted its concern regarding allegations of agreement in which "the pleadings mention[] no specific time, place, or person involved in the alleged conspiracies" because "a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin." Id. at 1971 n.10.

In this respect, the Court's analysis in Bell Atlantic comports with its previous rulings that the complaint must not only give the defendant fair notice of what the plaintiff's claim is, but also notice of "'the grounds upon which it rests.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Conley, 355 U.S. at 47). Therefore, although Plaintiffs argue correctly that they do not need to plead detailed facts underlying the conspiracy, Plaintiffs must do more than "merely alleg[e] a bare legal conclusion; if the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the

16

plaintiffs 'will get nowhere merely be dressing them up in the language of antitrust.'"

Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984).

Here, Plaintiffs claim Defendants entered into an actual agreement with the banks and other financial institutions that process Defendants' credit and debit card transactions to fix prices of those services and that, in turn, Defendants receive compensation for that agreement. However, Plaintiffs have not alleged any additional facts to support this bare allegation that would plausibly suggest an illegal agreement. The sum total of Plaintiffs' factual allegations with respect to concerted action between Defendants and the banks and other financial institutions is comprised of allegations that (1) Defendants charge Plaintiffs a processing fee for the credit and debit card transactions and Defendants retain that fee, Compl. ¶ 36; (2) Defendants have conspired with "numerous banks, banking associations and financial institutions throughout the United States to fix, peg, and stabilize the price of credit and debit card processing fees, commonly referred to as the 'Merchant Discount Fee,'" Compl. ¶ 38; and (3) Defendants receive an unidentified amount of compensation (i.e., a "kick back") as consideration for this agreement, which is not reimbursed to Plaintiffs, Compl. ¶ 39.

In a recent case in the Eastern District of Pennsylvania, the Court found allegations similar to Plaintiffs to be insufficient to satisfy the requirements under Rule (8)(a). In re Bath and Kitchen Fixtures Anti-Trust Litigation, 2006 WL 2038605 (E.D. Pa. 2006). Specifically, the plaintiffs alleged "that the defendants communicated with each other about the price of [the product], agreed to charge specific prices, issued price

announcements in accordance with these agreements and sold [the product] at the agreed upon prices." Id. at *3. Thus, the Court ruled that once distilled, in total, the plaintiffs merely alleged "that the defendants agreed to fix the prices of [the product], engaged in some unspecified communications and quoted prices and sold products at the agreed upon levels." Id. at *4. Here, Plaintiffs' allegations do not rise even to this level.

The Western District of Kentucky recently analyzed the pleadings of a price-fixing conspiracy alleged to exist between the defendants in light of the Bell Atlantic decision. Hyland v. Homeservices of America, Inc., 2007 WL 2407233 (W.D. Ky. 2007). The conspiracy alleged involved the defendants' agreement to price-fix within the city's real estate market by setting their commissions at 6% and prohibiting negotiations on that rate. Id. at *2. The Court found that the plaintiffs had met the pleading standards under Rule 8(a) in part because the plaintiffs supported the price-fixing assertion by including, among other facts, references to the enforcement actions brought by the Department of Justice, admissions of price-fixing by real estate brokers, and an exchange of price information and catalogues between the parties. Id. *3.

Hyland is obviously distinguishable from the case at bar, as Plaintiffs here have not provided any facts beyond the mere allegation that Defendants conspired to fix prices. Plaintiffs have not identified a single entity by name whom they believe to have conspired with Defendants. Plaintiffs claim only that the alleged agreement occurred at an unknown point in time within the four years prior to the filing of the complaint. Simply because unnamed banks and financial institutions contracted with Defendants to provide

18

processing services does not evidence illegally agreement to fix processing fees.  These are substantial allegations that require more than the mere recital of the name of the offense.  In short, Plaintiffs have failed to state sufficient facts to plausibly suggest the existence of an illegal agreement.  Thus, Defendants' motion to dismiss Claim II is GRANTED.[5]

### 3.    State Law Claims

Plaintiffs also allege various state law and common law claims, including breach of contract and violations of various provisions of the Indiana Deceptive Franchise Practices Act, Ind. Code § 23-2-2.7-2, et seq.  However, the only basis of federal jurisdiction for those claims is federal supplemental jurisdiction under 28 U.S.C. § 1367, which allows a federal court to decide state-law claims outside federal diversity jurisdiction if they are so closely related to the federal claims as to be considered part of the same case.  However, a federal court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c)(3).  The Seventh Circuit has identified three situations in which jurisdiction over supplemental claims should be retained even though the federal claims have been dismissed: (1) where the statute of limitations would bar the refiling of

---

[5] Because we conclude that the first amended complaint does not satisfy the pleading requirements of Rule 8(a), we do not address the other issues Defendants raise in their motion to dismiss.

supplemental claims in state court; (2) where substantial judicial resources have already been expended on the supplemental claims; or (3) where the outcome of the claims is obvious.  Williams Electronics Games, Inc. v. Garrity, 479 F.3d 904, 907 (7th Cir. 2007) (citing Wright v. Associated Ins. Cos., 29 F.3d 1244, 1251-52 (7th Cir. 1994)).

None of these situations applies in this case.  First, § 1357(d) "explicitly tolls the statute of limitations for 30 days after dismissal of a supplemental claim, to allow the plaintiff to refile the claim in state court without being time barred."  Williams Electronics Games, 479 F.3d at 907 (citing Edwards v. Okaloosa County, 5 F.3d 1431, 1433 n.1 (11th 1993)).[6]  Substantial judicial resources have not yet been expended on the supplemental claims as this is the first time these claims have been before us.  Finally, we do not believe the outcome of the state claims is obvious here.  Therefore, we exercise our discretion to decline to exercise supplemental jurisdiction in this case.  Thus, Claims III-VI are dismissed without prejudice for lack of jurisdiction.

## III.   *Conclusion*

For the reasons detailed above, we GRANT Defendants' motion to dismiss under Rule 12(b)(6) for failure to state a claim as to Counts I and II.  We also dismiss Counts III-VI without prejudice for lack of jurisdiction.  Final judgment will be entered

---

[6] Additionally, Indiana's Journey's Account Statute, Ind. Code. § 34-11-8-1, applies in this situation and provides that Plaintiffs have at least three years from the date of the federal court's determination to refile in state court.

accordingly.  IT IS SO ORDERED.


Date: _____09/28/2007_____

_Sarah Evans Barker_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies To:

J. Michael Baldwin
BAKER BOTTS L.L.P.
michael.baldwin@bakerbotts.com

Thomas P. Bleau
BLEAU FOX & FONG
tbleau@bleaufox.com

Joseph Gregory Eaton
BARNES & THORNBURG LLP
joe.eaton@btlaw.com

Charles P. Gaddy
GADDY & GADDY
gaddy@netdirect.net

Steven L. Leifer
BAKER BOTTS, LLP
sleifer@bakerbotts.com

Kendall  Millard
BARNES & THORNBURG LLP
kmillard@btlaw.com

Patrick H. Peters III
BAKER BOTTS L.L.P.
patrick.peters@bakerbotts.com

David M. Rodi
BAKER BOTTS L.L.P.
david.rodi@bakerbotts.com

T. Joseph Wendt

21

BARNES & THORNBURG LLP
jwendt@btlaw.com